NO. 07-01-0251-CV

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL A

NOVEMBER 29, 2001

_____

TEXAS ATTORNEY GENERAL JOHN CORNYN, APPELLANT

V.

FIFTY-TWO MEMBERS OF THE SCHOPPA FAMILY, ET AL., APPELLEES

_____

FROM THE 72ND DISTRICT COURT OF LUBBOCK COUNTY;

NO. 2001-512,435; HONORABLE J. BLAIR CHERRY, JUDGE

_____

Before BOYD, C.J., and REAVIS and JOHNSON, JJ.

In this interlocutory appeal, the Attorney General, appellant, challenges the denial by the trial court of his special exceptions and motion to deny the claims of appellees. The suit arises out of an action brought by 52 members of the Schoppa family, Marilyn and Tom Davis, Maxine Cato, the N.L. Douglas family, the George Weiss family, and 168 other named individuals on behalf of their families, living and deceased, herein appellees. In

their action, appellees sought to enjoin Texas Tech University Health Sciences Center (TTUHSC) or Texas Tech University (the University) from destroying DNA samples, brain tissue, and medical records collected in furtherance of research on Alzheimer's disease. The University is not a party to this particular appeal. Appellees, who are individual donors and representatives of deceased donors, also sought the return of samples given at the request of TTUHSC if it "was unwilling or unable to continue genetic based research." We reverse the order of the trial court and remand the cause for further proceedings in accordance with this opinion.

The research project in question was begun by Dr. Shirley Poduslo in 1994. She proposed the research to examine the influence of genetic factors in the development of Alzheimer's, Parkinson's, and Multiple Sclerosis conditions. The research required the collection of DNA samples, brain tissue, and detailed medical records on large numbers of people, with a particular emphasis on family groups. The University obtained written consent from each donor or representative to conduct this research. The consent forms specified that Dr. Poduslo was the primary researcher responsible for the project and that the subjects' medical records would be available to her. The forms also provided that the donors could "discontinue . . . participation in the study at any time." The research project was funded by a specific appropriation from the Texas legislature. By January 2000, the project had accumulated a DNA bank with over 10,000 samples from 2,200 family lines, 150 brains (137 from patients diagnosed with Alzheimer's disease), as well as a large collection of medical records. The project had received favorable reviews from

researchers at other institutions. However, the 1999 legislature did not make a separate appropriation for the project.

In 1999, the University discovered that 140 consent forms were missing. In the fall of that year, the Department Chair, R.B. Schiffer, had Dr. Guy McKhann of Johns-Hopkins review the program. After doing so, by letter dated January 14, 2000, Dr. McKhann referred to Dr. Poduslo's efforts to develop the DNA databank as "herculean" and only recommended that she collaborate with more researchers from other disciplines. The parties differ on the details of what transpired in late 1999 and early 2000 and the record as to that time is not fully developed. However, it is undisputed that Schiffer wrote a letter to Poduslo "relieving her" as head of research and assuming acting directorship of the program. Poduslo was not permitted access to the lab or to the donor charts. One month later, Schiffer wrote to the program donors notifying them that he would act as program director and Poduslo would "continue as an active senior investigator." In the letter, he notified donors that TTUHSC "is committed to continuing and expanding our research efforts."

In a March 27, 2000 letter to Poduslo, Schiffer outlined conditions by which she would be permitted to continue aspects of the research. Appellees alleged that sometime in October 2000, Schiffer denied he had prevented Poduslo from obtaining replacement consent forms, so Poduslo sent approximately 70 letters to donors concerning replacement forms. However, by letter dated October 27, 2000, Schiffer stated that Poduslo had sent

3

"unauthorized letters" to donors for whom consent forms could not be found and directed her to "stop immediately" as there was "great potential for litigation liability for unauthorized direct correspondence."

On December 10, 2000, Sandra Whelly, chair of the TTUHSC IRB[1] sent a letter to Poduslo stating one protocol authorizing the research (#90068) expired on December 1, 2000, and a second protocol (#90067) would expire on December 14. In the letter, she directed that all mailing of consent forms must occur by December 14, and all replies must be received by January 25, 2000 [sic]. The failure to do so would require destruction of those donors' samples.

In the suit underlying this appeal, appellees sued Dr. Joel Kupersmith in his capacity as dean of the TTUHSC School of Medicine and Dr. Schiffer in his capacity as Chair of the Department of Psychiatry. *Inter alia*, they alleged the research project was a charitable trust and they sought an injunction preventing TTUHSC from the "destruction of any DNA samples, brains or medical records associated with the DNA Alzheimer's Bank." They also sought a holding that upon "a determination that [TTUHSC] is unable or unwilling to continue genetic based research with Dr. Poduslo as the principal investigator," the school must return the DNA samples to those donors who no longer wished to participate in the research. In the alternative, they requested the appointment of a new trustee and the transfer of all DNA samples to that trustee.

---

[1]The record does not reveal what the "IRB" is, other than the fact that it is responsible for reviewing and approving research records.

4

On January 12, 2001, TTUHSC filed its answer. In that answer, it asserted numerous special exceptions, as well as affirmative defenses which included appellees' lack of standing and its sovereign immunity. On March 6, 2001, appellant filed a petition in intervention containing special exceptions asserting that appellant was the only proper party to represent the interests of the public in matters involving charitable trusts. After the case was removed to federal court and returned, appellant filed a motion to dismiss appellees' suit for lack of jurisdiction. In his motion, appellant characterized it as a "global plea to the jurisdiction seeking a dismissal of the Plaintiffs based on their lack of standing." This motion was overruled by the trial court. Hence, this appeal. In pursuing his appeal, appellant presents a single issue querying whether the trial court erred in denying his plea to the jurisdiction of the trial court based upon appellees' lack of standing.

Our first task is to determine whether we have jurisdiction of this interlocutory appeal. That is true because a lack of appellate jurisdiction is fundamental error. *New York Underwriters Ins. Co. v. Sanchez*, 799 S.W.2d 677, 678 (Tex. 1990). Appellees mount a two-fold argument that this court lacks jurisdiction to consider this appeal. In doing so, they first contend we lack jurisdiction over this appeal because it does not fall within the limited circumstances in which interlocutory appeals are permitted under section 51.014 of the Civil Practice and Remedies Code. Tex. Civ. Prac. & Rem. Code Ann. § 51.014 (Vernon Supp. 2001).

Because the trial court denied appellant's motion to dismiss, we must first consider whether subsection (a)(8) of the statute authorizes interlocutory appeals from the grant or denial of a plea to the jurisdiction "by a governmental unit as that term is defined in Section 101.001." Under the statute, a "governmental unit" includes the state and its agencies that constitute the government of Texas, including all departments, offices, and any organ of government whose authority is derived from the state constitution. *See* Tex. Civ. Prac. & Rem. Code Ann. §101.001(Vernon Supp. 2001). In *Perry v. Del Rio,* 2001 WL 893716, (Tex. App. Austin 2001, pet. dism.), the court had occasion to thoroughly explore the meaning of the term "governmental unit" and came to the conclusion that the governor, lieutenant governor and the secretary of state were included in the statutory term. *Id.* at pp.3-4. We agree with that holding and the court's reasoning and, in applying that reasoning, we hold that the Attorney General is likewise a "governmental unit" within the purview of the statute. Thus, we do have jurisdiction to consider appellant's appeal.

Appellees also contend that a plea to the jurisdiction is not a proper procedural device for challenging less than all the plaintiffs in a case. They reason that this is not actually an interlocutory appeal within the purview of section 51.014(a)(8) of the Code because, if it is determined that appellant is the only proper party, he would remain in the case. However, appellant filed a neutral intervention petition that made no substantive claims. If we reverse the trial court's denial of appellant's plea to the jurisdiction, the suit would be dismissed because appellant has not asked for any substantive claims. This is true because an intervention is subject to dismissal if it does not assert a cause or causes

6

of action or otherwise adopt the affirmative claims of litigating parties. *See Casteel v. Gunning*, 402 S.W.2d 529, 542-543 (Tex.Civ.App.--El Paso 1966, writ ref'd n.r.e.). If no affirmative relief is requested and the party or parties seeking affirmative relief are dismissed, there was no claim or claims to adjudicate and, therefore no subject matter jurisdiction.

We must next determine appellant's contention that appellees, the parties seeking to invoke the jurisdiction of the trial court, lack standing to do so. It is well established that standing is implicit in the concept of subject matter jurisdiction. *See Texas Ass'n of Business v. Texas Air Control Bd.*, 852 S.W.2d 440, 443 (Tex. 1993). The core of appellant's argument on appeal is that he is the only proper party to protect the public interest in this project which all parties characterize as being in the nature of a charitable trust. That being so, we will refer to the project as a trust. Implicit in appellant's argument is the assumption that the public's interest in the trust is the only interest that is affected by this litigation. He premises that argument on the characterization that in their suit, appellees "request a court order allowing them to control the research without interference from Texas Tech." Bottomed on that premise, he concludes that appellees have no standing to assert claims "in matters pertaining to how the charity operates or effectuates its charitable mission. That is what the Donor plaintiffs want to do in this case" and neither the consent form or any other authority allows them to exercise such control.

However, the plain language of the relief sought by appellees in their amended petition does not show they are trying to direct or control the research in this suit. Rather, they allege that they provided blood and brain samples and personal medical records for a specific research project and if TTUHSC is not going to pursue that research, or is not going to make use of specific samples, they seek a return of those samples.[2] The only portion of the relief sought by appellees which arguably appears to seek control of any part of the research project is the reference to "Dr. Poduslo as the principal investigator." The reason for this qualification seems clear, as she is the only person listed on the consent forms as the investigator responsible for the project and to whom medical records could be released. For this reason, and under this record, the authorities cited by appellant on the issue of donors seeking to exercise control over the administration of a charitable trust are not applicable. *See Carroll v. City of Beaumont*, 18 S.W.2d 813 (Tex.Civ.App.--Beaumont 1918, writ ref'd) (plaintiff alleged mismanagement of trust and sought accounting); *Victims v. Funds, Third Parties and Reeves County*, 715 F. Supp. 178 (W.D. Tex. 1989) (plaintiffs sought accounting of relief donations); *Russel v. Yale Univ.*, 737 A.2d

---

[2]The specific wording of appellees' request for relief is:

Upon final hearing and a determination that Defendants are unable or unwilling to continue genetic based research with Dr. S.E. Poduslo as the principal investigator that the Court order Defendants to return all samples to those participants who actively withdraw their consent to further participation in the study. . . . And that the Court further order that the materials be returned to plaintiffs at such institution as may be designated by Plaintiffs.

941(Conn.App.Ct.) (donors alleged mismanagement of trust and sought to enjoin school reorganization).

The existence of a public interest in a public trust does not necessarily preclude private interests in the same trust. The distinction between public and private interests was discussed in *Carroll,* in which the court used as examples of private interests in a public trust situations in which donors were "claiming a reversionary interest by reason of a forfeiture for the breach of the trust, the termination of the trust for some reason, such as the heirs of the donor or someone entitled in private right to the property as a result of a revision." *Carroll,* 18 S.W.2d at 819. The facts alleged by appellees here, which we must accept as true for the purpose of determining their standing, *Bybee v. Fireman's Fund Ins. Co.*, 160 Tex. 429, 331 S.W.2d 910, 917 (1960), essentially allege a termination of the trust by reason of TTUHSC's apparent decision to discontinue the research for which the donations were made. Thus, if the trial court were to find that the evidence justified a finding of termination of the research, and thereby termination of the trust because of a failure of purpose, it could also find that appellees had a reversionary interest that would support standing. *Carroll*, 18 S.W.2d 819. Such a disposition would be consistent with the rule applicable to failures of express trusts, the effect of which is to create a resulting trust in favor of the settlor. *See Bogert,* Trusts, section 147 (6th Ed. West 1987).

Our required acceptance of appellees' allegation of the apparent termination of the research and destruction of the samples is also relevant to determination of appellant's argument that appellees do not have standing when the general rules applicable to standing are considered. Appellant cites *El Paso Community Partners v. B. & G. Sunrise Joint Venture*, 24 S.W.3d 620 (Tex.App.--Austin 1998, no writ), as enumerating the factors to be considered in determining standing to bring a suit.

Those factors are whether: 1) the plaintiff has sustained, or is in immediate danger of sustaining, some direct injury as a result of the act about which complaint is made; 2) there is a direct relationship between the alleged injury and the claim to be adjudicated; 3) the party has a personal stake in the controversy; 4) the challenged action has caused the plaintiff some injury in fact, either economic, recreational, environmental, or otherwise; or 5) the plaintiff is an appropriate party to assert the public interest in the matter, as well as the plaintiff's own interest. *Id.* at 624.

In challenging appellees' standing, appellant argues their only interest is in the discovery of treatment or a cure for Alzheimer's disease. That is true as to some appellees. For those living appellees who have provided blood samples and access to their medical records, the destruction of those samples would cause no direct injury, because their desire to support Alzheimer's research by providing DNA samples and medical records would not be foreclosed by TTUHSC's decision to discontinue the research or not to use the samples provided. It is not clear how they would be harmed by

any misrepresentation by TTUHSC about continuing the research. It appears that the only harm those particular appellees would suffer would be to be denied the opportunity to discover if they had a genetic predisposition to the disease. That harm would be highly speculative in nature in that it was not established that such genetic markers were identified in individual appellees and, even if they were, there is nothing to show that those particular appellees could not have their DNA examined elsewhere for that purpose.

Even so, as to those appellees who have authorized the use of blood samples from deceased relatives or, more particularly, might have donated part or all of a deceased relative's brain, their interest would be very different from that of the general public. The decision by those appellees to donate those type of samples may well have been the result of difficult personal decisions regarding the disposition of their deceased relative's remains. The donation of such remains would also preclude participation in any other research projects.

Additionally, the consent forms do not purport to be integrated agreements between the parties. Therefore, evidence of other agreements or representation could be introduced. If that evidence should reveal that the donations were motivated by representations concerning TTUHSC's commitment to the research and those representations were false, those donors would have suffered direct harm as a result of such conduct.[3] They may also be able to show that religious considerations motivated the

---

[3]We express no opinion as to whether any agreement or representation not expressed in the consent forms would be enforceable as to TTUHSC.

11

disposition of the brain material in a manner different from the ordinary practices of a research university. As to those individual appellees, appellant would not be the proper party to litigate those issues

We also note that the donor consent forms specifically provide donors with the right to "discontinue my participation in this study at any time I choose," and did not specify the effect of the donor's election to "discontinue" participation. When the evidence is more fully developed, a factfinder might find that the participants have a reversionary interest in the samples supplied. Such an interest would support standing. *See Carroll*, 18 S.W.2d at 819.

For the reasons we have stated, the record before us does not establish which of appellees ground their claims on donations of decedents' blood and brain tissue. We must, therefore, reverse the order of the trial court and remand this proceeding for further proceedings consistent with this opinion.

John T. Boyd
Chief Justice

Publish.